**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**WESTERN DIVISION**

BILLI JO FUHRMAN,

        Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

No. C05-4008-MWB

**REPORT AND RECOMMENDATION**

_____

## *TABLE OF CONTENTS*

I.     **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.    **PROCEDURAL AND FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . **2**

    *A.*    *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**
    *B.*    *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
        *1.*    *Introductory facts and Fuhrman's hearing testimony* . . . . . . . **3**
        *2.*    *Other witnesses' hearing testimony* . . . . . . . . . . . . . . . . . . . **8**
        *3.*    *Fuhrman's medical history* . . . . . . . . . . . . . . . . . . . . . . . **11**
        *4.*    *Vocational expert's testimony* . . . . . . . . . . . . . . . . . . . . **22**
        *5.*    *The ALJ's decision* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

III.   **DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND**
     **THE SUBSTANTIAL EVIDENCE STANDARD** . . . . . . . . . . . . . . . . . . **26**

    *A.*    *Disability Determinations and the Burden of Proof* . . . . . . . . . . . **26**
    *B.*    *The Substantial Evidence Standard* . . . . . . . . . . . . . . . . . . . . . **29**

IV.   **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32**

V.    **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **33**

# I. INTRODUCTION

The plaintiff Billi Jo Fuhrman ("Fuhrman") appeals a decision by an administrative law judge ("ALJ") denying her applications for Title II disability insurance ("DI") and Title XVI supplemental security income ("SSI") benefits. Fuhrman claims the ALJ erred in discounting the credibility of Fuhrman and her witnesses, particularly with regard to the severity of Fuhrman's headaches and their impact on her ability to work. (*See* Doc. No. 7)

# II. PROCEDURAL AND FACTUAL BACKGROUND

## A. Procedural Background

On August 20, 2002, Fuhrman protectively filed applications for DI and SSI benefits, alleging a disability onset date of May 8, 2002. (R. 63-65, 275-77; *see* R. 278) Fuhrman alleged she was disabled due to "Chiari Malformation type 1/Depression." (R. 74) She alleged her condition rendered her unable "to perform multitask duties due to mental shutdown from overload, headaches, vertigo, muscle pain/weakness, severe fatigue and difficulty reading and writing at times." (*Id.*) Her applications and requests for reconsideration were denied. (R. 45-49, 51-54, 279-90)

Fuhrman requested a hearing (*see* R. 55-57), and a hearing was held before ALJ Robert Maxwell on February 4, 2004, in Spencer, Iowa. (R. 292-361) Fuhrman was represented at the hearing by attorney John Moeller. Fuhrman testified at the hearing, and she offered the testimony of her mother, Glenda Schleef; her boyfriend, Scott Banks; and Karla Markley, a friend and former coworker. Vocational Expert ("VE") Julie Svec also testified.

On September 21, 2004, the ALJ ruled Fuhrman was not entitled to benefits. (R. 13-31) Fuhrman appealed the ALJ's ruling, and on November 18, 2004, the Appeals Council denied Fuhrman's request for review (R. 6-9), making the ALJ's decision the final decision of the Commissioner.

Fuhrman filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 3) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of Fuhrman's claim. Fuhrman filed a brief supporting her claim on April 27, 2005. (Doc. No. 7) The Commissioner filed a responsive brief on June 20, 2005 (Doc. No. 8) The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Fuhrman's claim for benefits.

## B. Factual Background

### 1. Introductory facts and Fuhrman's hearing testimony

At the time of the hearing, Fuhrman was thirty-five years old. She was living in Webb, Iowa, with her four children, ages ten to fourteen; her boyfriend Scott Banks; and Scott's eleven-year-old son. (R. 296-97) She was not working, but was receiving $548 monthly in state assistance, as well as $450 monthly in food stamps. Her children received medical care through Medicaid. (R. 297-98)

Fuhrman graduated from high school in 1987, and then went to nursing school, becoming a Registered Nurse. She last worked as a nurse at a nursing home in Spencer, Iowa, where she was employed from 1998 until May 8, 2002. (R. 298-99) In that job, she arrived at work at 7:00 a.m., and spent the early morning, before breakfast time, administering medications, checking blood sugar levels, and giving insulin injections. She also did wound treatments as necessary. After breakfast, she gave additional medications and other treatments to patients, took doctors' orders, completed nursing notes, and monitored patients. (R. 299-300) Fuhrman took medical leave from the job in May 2002, and never returned to work. (R. 300-01) She described her reasons for leaving as follows:

> I kind of grew, up to the point where I couldn't remember
> things from minute to minute. I was taking doctors' orders,
> and I would forget that they had called two minutes later. I
> would forget to do things in my job. I was getting severe
> headaches. I would go home and I'd sleep all afternoon. The
> kids would be taking care of themselves. And it just – I
> couldn't remember. I couldn't function.

(R. 300)

Before Fuhrman worked at the nursing home, she worked at Spencer Municipal Hospital for one year, on the acute floor. She administered medications, did wound care treatment, and cared for post-surgical patients. She gave two weeks' notice, and then went directly into the nursing home job, which she stated paid "a lot more" than the hospital. (R. 301-02)

Prior to working at the hospital, she was in school. During school, she worked at a jeans manufacturer for two months, using a large sewing machine to sew zippers onto jeans. She was paid on a per-piece basis and stated she could not keep up with the work pace, which was very rapid. (R. 302-03) Before this job, she stayed at home with her children from about 1993 to 1995. Before that, she worked as an LPN, prior to going back to school to become a Registered Nurse. (R. 303-04) Before working as an LPN, she worked from about 1987 until 1992, as a Certified Nursing Assistant and a cook in a nursing home. (R. 304)

Fuhrman stated the primary physical problem that prevents her from working is her headaches. In late 1999, she was diagnosed with Arnold Chiari I Malformation, which Fuhrman described as "a hernia in the brain."[1] (R. 305) She was diagnosed following an

---

[1]The website of the National Institute of Neurological Disorders and Stroke provides the following information on Chiari Malformation:

> Arnold-Chiari Malformation is a condition in which the
> cerebellum portion of the brain protrudes into the spinal canal. It may or
> may not be apparent at birth. Arnold-Chiari I type malformation usually
> causes symptoms in young adults and is often associated with syringo-
> myelia, in which a tubular cavity develops within the spinal cord. . . .

episode at work during which she forgot what day it was, her vision blurred, and she felt faint. She was taken to the emergency room and had an MRI that resulted in the diagnosis. (R. 306)  She saw a neurologist and a neurosurgeon in Iowa City, and, according to her, the doctors stated her condition was not severe enough for surgical treatment and they told her "to go home and live with it." (R. 307)  However, she stated the doctors confirmed the diagnosis, and told her the condition could be causing her headaches as well as depression. (R. 307-08)  She was not offered any treatment options, and it is her understanding there is no treatment for the condition other than surgery. (R. 308)

Fuhrman stated her symptoms include the following:

> Headaches, severe confusion, dizziness – drop attacks is what they call them, when you just kind of fall down. I would – there's been a couple of times where I've lost – forgotten where I was at when I was driving down the road. Tremors, and – tremors, blurred vision. I have floaters, severe fatigue, slurred speech. And I don't have a gag reflex, so I choke a lot.

(*Id.*)  Her symptoms continued to worsen, and she saw several doctors for treatment. She was referred to Dr. Dan S. Heffez in Chicago, who evaluated her in the fall of 2003. According to Fuhrman, Dr. Heffez stated the Iowa City doctors had misread her MRI, and her herniation was actually twice as large as they had thought. He recommended surgery, which he stated had a 50% chance of relieving her symptoms. Fuhrman planned to have the surgery as soon as her insurance was approved. (R. 308-10)  She stated there was a lot of paperwork involved in getting a Chicago hospital approved for payment through

---

Either type of Arnold-Chiari Malformation can cause symptoms of headache, vomiting, difficulty swallowing, and hoarseness.

Adults and adolescents who are unaware they have Arnold-Chiari I type malformation may develop headache that is predominantly located in the back of the head and is increased by coughing or straining. Symptoms of progressive brain impairment may include dizziness, an impaired ability to coordinate movement, double vision, and involuntary, rapid, downward eye movements.

*See* http://www.ninds.nih.gov/disorders/chiari/chiari.htm (Nov. 8, 2005).

Iowa Medicaid. She was reluctant to have the surgery done by the Iowa City surgeon who told her "to go home and live with it." (R. 311)

In addition to, or possibly related to, the Chiari malformation, Fuhrman suffers from depression, for which she takes Paxil; irritable bowel syndrome, which was diagnosed in about 2002, when she had some colon polyps removed (*see* R. 329); chronic fatigue syndrome; and fibromyalgia. She stated she was diagnosed with fibromyalgia on January 7, 2004. (R. 330) She had been referred to a specialist, and had an evaluation scheduled subsequent to the hearing. (R. 311-12) Fuhrman stated she has generalized joint paint throughout her body, as well as muscle spasms. (R. 313) She takes Flexeril, a muscle relaxant, to prevent muscle spasms, and pain medications for her headaches and joint pain. She takes Vistaril, Duragesic, Fentanyl patch, and Ultram. (R. 314-15, 330) She also takes Zyprexa to help her sleep. (R. 315) The Paxil and Zyprexa were prescribed by Dr. Hunziker, Fuhrman's family doctor, but he has never suggested she follow up with a mental health professional. (R. 329)

Regarding her headaches, Fuhrman stated they occur every day. She has one type of headache that lasts all day, and another, "very severe" headache that she gets four times a week. When she gets a severe headache, it may last for hours, and she takes medication to make her sleep. No particular activity causes the headaches, but she has noticed weather changes may precipitate a headache. When she takes medication for a severe headache, she usually sleeps the rest of the day and her children fix their own food. (R. 315-17)

In addition to headache pain, Fuhrman experiences pain in her thoracic and lumbar spine, hips, knees, and shoulders. She has back pain most of the time, and her back "cracks and pops." (R. 317) According to Fuhrman, doctors have indicated she has some degenerative disk disease. (*Id.*) She has an aching-type hip pain three or four days a

week.  She has similar aching pain in her knees and shoulders.  If the weather changes, the pain may worsen.  Going up and down stairs makes the pain worse, as well.  (R. 317-18)

Fuhrman can lift a gallon of milk or a bag of groceries, but her boyfriends helps her do any other lifting.  She needs to change position while sitting, but otherwise she has no difficulty sitting.  She is unable to stand for more than a couple of a minutes without pain.  She has difficulty walking, and uses a cane to walk around her house.[2]  She would be "worn out and in pain" if she walked as far as a city block.  (R. 318-19)  When she does anything that takes physical effort, such as walking or putting in a load of laundry, she will "have to go and sit down for a half-hour to compensate for it[.]"  (R. 319)  She has difficulty climbing stairs and bending, and she does not stoop because it gives her a headache.  Her grip strength has weakened, and although she can pick up small objects, she cannot perform repetitive fine manipulations.  (R. 320)

She has memory problems, short-term more than long-term, and she has told her doctors about these problems but has not had any specific memory testing.  (R. 320-22)  She is unable to get to sleep without medication, but with her medications she can usually sleep through the night until about 5:30 a.m. without awakening.  (R. 322)

Fuhrman can do some household chores, such as laundry.  Her boyfriend does a lot of the cooking and her children do cleaning chores around the house.  She can go grocery shopping if someone else puts the items into the cart.  She goes to church every Sunday.  She is able to crochet a bit.  (R. 322-23)

Fuhrman opined there is no type of work she could do.  She stated she is unable to take care of herself and her house without assistance.  She stated she misses working and would like to return to work, but it is unacceptable for her to forget doctors' orders, or

---

[2]The cane was not prescribed by a doctor.  It belonged to her grandmother, and Fuhrman just uses it to get around her house.  She does not use the cane in public.  (R. 331)

forget whether she has administered insulin or given medications. Her daily headaches and her difficulty doing anything physical also would prevent her from working. (R. 324)

Fuhrman noted that when she was working, her job performance reports were favorable, she got along well with coworkers and supervisors, and her job was in good standing when she took her leave of absence. However, toward the end, her performance evaluations noted she was forgetting things and having memory problems. Fuhrman stated her employer was willing to work with her, but she reached the point where she believed she was a danger to patients and she did not want to hurt anybody. (R. 325-26)

Fuhrman explained she lost her driver's license because of fines she was unable to pay when she quit working. However, she stated she is unable to drive in any event because she has staring "episodes," and she feels it is unsafe for her to drive. (R. 323, 327-28)

## 2.  *Other witnesses' hearing testimony*

Fuhrman's friend and coworker, Karla Markley, testified she worked as a nurse's aide at the nursing home in Spencer from 1995 to 2003, which encompassed the entire time Fuhrman worked at the nursing home. Fuhrman was one of the nurses who supervised Markley. She observed Fuhrman having trouble remembering things at work, such as making sure patients received medications on time. Markley stated Fuhrman was "always a little forgetful," but her condition really worsened the last few weeks she was on the job. Markley had to remind her about what she was supposed to be doing next. (R. 334-37)

She stated Fuhrman complained of being in pain "all the time," and stated her head and back hurt. Fuhrman helped the aides lift patients and turn them onto their backs, and accordingly Markley, "that was just horrendous on her back and her head[.]" (R. 337) Fuhrman complained of headache pain "[a]ll day." (R. 338) According to Markley, Fuhrman complained of headaches from the time she started working at the nursing home, but her headaches worsened dramatically during the last three weeks of her job. (R. 340)

Markley did not know Fuhrman before they worked together at the nursing home. She has maintained contact with Fuhrman since Fuhrman left her job, and they have become good friends. Markley stated she talks with Fuhrman four or five times a week, either on the phone or in person. She stated Fuhrman continues to complain of pain, and she often cuts their conversations short because she has to lie down. Markley stated she can see the pain on Fuhrman's face. (R. 339)

Scott Banks testified he has known Fuhrman about three years, and they began living together in about June 2003. He works as a consultant, and also does UPS deliveries. He works Monday through Friday, from 8:00 a.m. to 3:30 p.m. at one job, and then from 4:30 p.m. until around 8:30 p.m. to 9:00 p.m. at the second job. He is home on the weekends. He had just started the evening job a month earlier; before that, he had been home every night after 5:00 p.m. (R. 342-43)

Banks stated Fuhrman "does a lot of delegating" of the household chores to her children, and Banks and the children help out with cleaning and laundry. Banks has installed laundry chutes so the family can get their laundry to the basement where the washing machine is located. Fuhrman tries to make sure things are picked up around the house, but she has problems with balance and falls down frequently. He stated she will have cuts and bruises on her body from falling down, and she has to hang on something to pick up items off the floor or she will fall. According to Banks, Fuhrman is "pretty proud of herself, so she tries not to complain," but she still complains of having headaches all the time. (R. 344, 346) He stated she has headaches every day, some worse than others. With some headaches, she has to lie down and take medication, and other headaches will come and go. (R. 344-45) He estimated Fuhrman gets headaches that require her to lie down at least four times a week. (R. 345)

Banks stated Fuhrman has difficulty walking, and she holds onto his arm for support when they go to church or the grocery store. She uses a cane to get around at home, but she does not like to take it out in public. (R. 345-46)

9

Banks drives Fuhrman wherever she needs to go, and in his opinion, Fuhrman should not drive.  (R. 346)

Glenda Scleef is Fuhrman's mother.  Schleef is a Registered Nurse, and is Director of Nursing at her job.  She has a close relationship with Fuhrman.  She sees her at least weekly and talks to her on the phone daily.  Schleef has accompanied Fuhrman to doctors' appointments on occasion and is familiar with Fuhrman's diagnoses.  (R. 348-49)

Schleef stated she calls Fuhrman every day, and Fuhrman complains of a headache every time she talks to her.  According to Schleef, Fuhrman has had headaches her entire life, but they had increased in severity and frequency over a six- to seven-year period.  She stated Fuhrman had complained of forgetfulness on her job from time to time, but the problem increased until, toward the end of the job, Fuhrman was describing problems remembering if she had administered medications, and Fuhrman expressed fear that she was going to hurt a patient.  In Schleef's opinion, Fuhrman continued trying to work longer than she should have.  (R. 349-51, 353)

Schleef stated at first, Fuhrman did not have any problems walking or with balance, but during the previous year, she had begun having trouble with her gait and balance.  She has observed that Fuhrman is unable to lift much, and her memory problems have increased greatly.  According to Schleef, Fuhrman may lose track of a conversation in the middle of talking with Schleef, and she opined Fuhrman's short-term memory is impaired. (R. 351-52)

In Schleef's opinion, Fuhrman will be unable to work until she "gets this situation fixed surgically."  (R. 352)  Schleef expressed the reasons for her opinion as follows:

> Because she is a registered nurse.  You need to focus. You need to be able to have a clear mind in order to do your job and to take care of people to be safe.  Any lifting and repetitive things seem to bring a headache on.  She needs to know her job.  If she has a lot of things coming at her at the same time, she just kind of shuts down and that's it.

(*Id.*)

### 3. *Fuhrman's medical history*

The earliest record evidence of Fuhrman's medical care is a record of her examination by Daniel H. Richter, M.D. on November 29, 1999. Fuhrman reported "continuing to have some problems with some confusion and just not feeling very well." (R. 228) She was experiencing intermittent spasms in her hands and occasional headaches, and she was concerned because "things [were] still not right." (*Id.*) The doctor diagnosed Fuhrman with depression and anxiety. He planned to send Fuhrman to the neurology clinic in Iowa City for an evaluation. (*Id.*)

On January 28, 2000, Fuhrman called her doctor complaining of episodes of shortness of breath, chest discomfort, and anxiety. The doctor prescribed Xanax. (R. 225)

In March 2001, Fuhrman injured her shoulder at work while she was lifting a patient. She underwent arthroscopic surgery on June 12, 2001, and apparently recovered well because the record contains no subsequent evidence of shoulder problems. (*See* R. 189-94, 221, 223-24)

On November 16, 2001, Fuhrman called her doctor's office to request a refill of a prescription for Paxil. The drug originally had been prescribed by a physician's assistant at Siouxland Mental Health, and Fuhrman stated it was working well for her. Daniel Richter, M.D. refilled the prescription. (R. 221)

On November 27, 2001, Fuhrman was seen with complaints of headaches, nausea, abdominal pain, and generally not feeling well for a couple of months. She was treated for the abdominal symptoms. (R. 220-22)

On April 16, 2002, Fuhrman called her doctor's office complaining of persistent posterior headaches, dizzy spells, and forgetfulness. Notes indicate an MRI from November 2000 showed a Chiari Type I malformation, although records from the MRI are not in evidence in this case. Fuhrman was concerned there had been some change in her condition and she requested another MRI. (R. 219) An MRI was done on April 22, 2002.

It showed no significant changes since November 1999, and was felt to be a relatively stable brain MRI. (R. 186) Nevertheless, because of Fuhrman's headaches, her doctor recommended she follow up with a neurologist in Iowa City. (R. 219)

On May 6, 2002, Fuhrman was evaluated by doctors in the Department of Neurology at Iowa City. She reported a "long-standing history of headaches, and memory difficulties, which had worsened over the last two years." (R. 199) She apparently had been evaluated in the same department in 1999, but she stated her symptoms had worsened since that time. Doctors noted the following history of her present illness:

> 1) Approximately two years ago, she noted daily occipital headaches, located on the right occiput with radiation to neck and shoulder, and wrapping around her head to her temples, and ears. She describes the pain as "popping off." At [its worst], it is associated with nausea, phono- and photophobia. The intensity [is] variable, but at [its worst], 9/10, and it waxes and wanes. Medications tried include Darvocet, which gives her approximately 30 minutes of relief, Tylenol, which does nothing, naproxen, which did nothing. She has not been tried on any triptans medications or any prophylactic headache medications. Associated symptoms included difficulty with balance, with "stumbling gait," and one episode of a fall.
> 2) Memory difficulties. This has been present especially in the last two years, and has hindered her performance at work. She describes her "confusion spells" as lapses in short-term memory, not knowing what she wanted to get in a room when she arrived there, forgetting people[']s names, et cetera. She denies any overt loss of orientation. This has been particularly stressful to her. . . . MRI in April of 2002, showed evidence of descended cerebellar tonsils consistent with Chiari malformation type I, and hypodensity noted in the region of the pineal gland, both abnormalities unchanged since 1999.

(R. 199) Fuhrman reported current symptoms of fatigue, tiredness, and muscle pain. (*Id.*)

Fuhrman's mental status exam was within normal limits. Doctors recommended the following:

1) Chronic daily headaches. Since there is a history of migrainous features to this headache, we recommend a trial of prophylaxis. No medications have been tried thus far, and we believe that a first line medication would include nortriptyline 25 mg p.o. every day to be escalated to a maintenance dose of 75 mg q.h.s., and can be titrated up thereafter. As for her abortives, we discussed at length the relationship between excessive NSAID use/or Tylenol use, and rebound headaches. She agrees to stop taking any over-the-counter headache pain relievers, since they are not helping, and will take as needed hydroxyzine 25 mg-50mg p.o. q.6h p.r.n. We also offered the possibility of inpatient treatment with DHE, and at this time, it is declined. There are many therapeutic choices that we could try if the initial plan does not relieve her headaches. Triptans have not been extensively used, and may be a viable abortive option. 2) Memory difficulties. At this time, we recommend a formal neurocognitive testing to reveal if there is any specific pattern of early dementia, versus pseudo-dementia of depression. 3) Chiari malformation type I. The MRIs were reviewed, and showed stable findings mild of cerebellar tonsil herniation. We do not believe that the Chiari malformation is responsible for her constellation of symptoms, although we do recommend that she may consider on her own, neurosurgical evaluation of her films. She agrees to return to clinic in four to six months.

(R. 200; *see* R. 197-98)

On May 17, 2002, Fuhrman went to the emergency room at Spencer Hospital complaining of difficulty breathing, nasal congestion, and a dry cough. A chest X-ray was unremarkable. She was diagnosed with bronchitis, given prescriptions for a Z-Pack and Phenergen, and told to force fluids and take Tylenol. (R. 181-85)

On May 29, 2002, Fuhrman was seen in the Department of Neurosurgery in Iowa City "for evaluation of her Chiari I and possible association with current symptoms." (R. 197) Fuhrman complained of occipital headaches radiating to the frontal area. She described the headaches as throbbing, and feeling like pressure over her entire head. She reported occasional photophobia and phonophobia with the headaches, but no nausea or

vomiting. She also reported short-term memory difficulties, ataxia, and intermittent difficulty with swallowing and breathing. Doctors opined "the constellation of symptoms that [Fuhrman] presented to [the] clinic with could be a combination of possible Chiari and other pathology." (*Id.*) They ordered MRI studies to determine if there was any hindrance of the flow of cerebrospinal fluid, noting that if hindrance of flow were present, then some of her symptoms could be due to the Chiari I malformation, while if there was no hindrance of flow, then her symptoms would be due to other causes. They also recommended Fuhrman receive neurocognitive testing. (R. 197-98)

The MRI, performed on June 21, 2002, yielded the following findings:

1) Cerebellar tonsils are projecting 3 mm below the level of foramen magnum.
2) Possible cyst in the clivus measuring 5 mm in size.
3) The CSF flow is normal.

(R. 196) Because the MRI showed good cerebrospinal fluid flow, doctors did not believe Fuhrman's symptoms were related to the Chiari malformation. (R. 195)

Fuhrman was not satisfied with the opinions of the doctors in Iowa City. She saw Andrea Crew, a Physician's Assistant at her family doctor's office, on July 29, 2002, to discuss her condition and its effects on her ability to work. P.A. Crew noted the following:

> [Fuhrman] comes in today basically to clarify work restrictions. She has been having problems for the last many months with memory "mental overload", headaches which have been worked up through the Iowa City Clinics. There is still some question of whether this is related to her Chiari type 1 malformation. Basically at this time [Fuhrman] feels that she is not able to function as charge nurse at work where she is an RN at Longhouse but would like to try going back as a treatment nurse. She feels that the multi task duties of the charge nurse are too overwhelming and the symptoms she is experiencing would prohibit her from doing that.
>
> She does understand that they may not be willing to allow her to do that and she is contemplating a profession

14

change regardless but is trying to do this at least short-term until she can figure that out for financial reasons. She did try to get in at Rochester but that was unsuccessful. She is considering where she would like to go for another Neurology opinion as she is not satisfied with Iowa City's opinion. Basically they feel that her symptoms are not related to the malformation and that no surgical intervention is warranted. They recommended she go back to the Neurology Dept. for psychological testing. . . . I recommended that she watch for any change in symptoms. She is going to still think about where she would like to go for a second opinion and to call if anything should worsen in the meantime.

(R. 217-18)

Fuhrman was next seen by P.A. Crew on October 15, 2002, for an annual physical exam. Regarding her headaches, vertigo, and memory problems, Fuhrman reported her symptoms had stabilized. She had quit working as a Registered Nurse and opined she would be unable to return to work as an RN. She planned to try to find a less stressful job that did not require acute memory skills. Because her symptoms had not worsened, she was going to put off any further evaluation and continue on her current medications of Maxzide and Paxil. (R. 213-14)

On November 13, 2002, Fuhrman underwent a psychodiagnostic disability evaluation by Steven B. Mayhew, Ph.D. (R. 201-02) Fuhrman reported clinical problems including "forgetfulness, confusion, fainting spells, terrible headaches, speech slurring and fatigue," as well as "constant nausea, vertigo, muscle weakness and muscle pain." (R. 201) She related an incident that occurred two weeks earlier when she was driving with her children in the car and forgot where she was for about 30 seconds. She reported being in constant pain across her shoulders and down her spine, difficulty swallowing, chronic fatigue, and depression stemming from her inability to work and resultant financial difficulties. She stated she could no longer "multi task." (*Id.*) Dr. Mayhew believed Fuhrman "to be a good historian, providing adequate and consistent information." (*Id.*) She was cooperative and appropriate during the evaluation. (*Id.*)

Fuhrman's immediate memory recall was 4 of 4 correct, but after a five-minute delay her recall was only 1 of 4 correct. She exhibited difficulty with numerical calculations. Dr. Mayhew assessed Fuhrman's level of intellectual functioning as being in the average range when compared to her same-age peers. He found no apparent deficits in Fuhrman's ability to read, do laundry, prepare meals (although he noted her thirteen-year-old daughter helped with meals), and meet her transportation needs. For reasons not stated in his report, Dr. Mayhew was unable to make an assessment of Fuhrman's capacity to understand, retain, and follow work-related instructions and procedures; sustain attention, concentration, and reasonable pace at entry-level work-like tasks; and tolerate the stress and pressure of simple, unskilled work, and respond appropriately. He found no impairment in her ability to interact appropriately with supervisors, coworkers, and the general public. (R. 202) He assessed Fuhrman's current GAF at 41-50, indicating "serious impairment in social, occupational, or school functioning." (*Id.*)

On January 11, 2003, Dennis A. Weis, M.D. reviewed Fuhrman's records and completed a Physical Residual Functional Capacity Assessment form (R. 152-59). In Dr. Weis's opinion, Fuhrman should be able to lift up to twenty pounds occasionally and ten pounds frequently; stand, walk, or sit, with normal breaks, for about six hours in an eight-hour workday; and push or pull without limitation. He opined she would have occasional postural limitations in all positions, but he found her to have no manipulative, visual, communicative, or environmental limitations. Dr. Weis found Fuhrman's allegations to be "eroded to a degree due to the fact that she takes minimal if any analgesics for her condition and has had little neurologic findings other than radiographic evidence of an Arnold-Chari [sic] malformation which is not felt related to her condition." (R. 160) On July 2, 2003, Claude H. Koons, M.D. reviewed, and concurred in, Dr. Weis's findings. (R. 159)

On February 5, 2003, Lon Olsen, Ph.D. completed a Psychiatric Review Technique form in which he concluded that beginning on November 13, 2002, Fuhrman has suffered

from a major depressive disorder that would cause her mild functional limitations in her activities of daily living and maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (R. 162-75) Dr. Olsen found that prior to November 13, 2002, the record contained insufficient evidence to reach any conclusions regarding Fuhrman's work-related abilities from a mental health standpoint. (R. 162) He opined Fuhrman would be moderately limited in the ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting. He opined she otherwise would have no significant work-related limitations due to mental health problems. (R. 176-79)

Dr. Olson noted Fuhrman had no history of mental health treatment. He found Dr. Mayhew's GAF score was "not well-supported and . . . inconsistent with other evidence in file[.]" (R. 180) He noted Fuhrman cares for herself, does some household chores, shops for groceries, takes her children to and from school and other activities, does her own banking, goes to doctor appointments alone, drives almost daily, sews, gardens, cans food, uses the computer, watches television, socializes occasionally, attends church, and gets along well with others. He noted Fuhrman's children help with some household chores, her daughter prepares some of the meals, Fuhrman's mother helps with some errands, and Fuhrman sometimes cannot remember what she reads or watches on television. She sometimes responds poorly to criticism, stressors, and changes in routine. She is forgetful and distractible, has great difficulty with tasks involving multiple steps, and relies on her mother to help her pay bills and manage money. (*Id.*)

In summary, Dr. Olsen found Fuhrman does have mental limitations but not to the extent that she would be precluded from performing all work-like activities. He opined she would be able to perform activities that do not "require attention to detail, sustained

vigilance, working without supervision, frequent changes in routine, or intense supervisory oversight." (*Id.*)

On April 14, 2003, David A. Christiansen, Ph.D. reviewed Dr. Olsen's findings and concurred in his conclusions. (R. 162)

On February 7, 2003, Fuhrman saw Dr. Richter for follow-up of her headaches. She complained of continued problems with memory, ataxia, confusion at different times, and shoulder pain. She was taking Paxil, and stated she was unable to function without it. She was not working and was applying for disability benefits. Fuhrman had located a clinic in Missouri that specializes in Arnold-Chiari malformation problems, and Dr. Richter planned to assist her in attempting to obtain Title XIX approval to be seen at the clinic. (R. 203)

On February 25, 2003, Fuhrman saw Dr. Richter for follow-up, complaining of an increase in the frequency of her headaches. She reported taking high doses of Ibuprofen, Tylenol, Aleve, and Naprosyn, with little relief. Fuhrman was reluctant to try narcotics because they made her sleepy. Dr. Richter prescribed a trial of Midrin, to be taken at the onset of a headache and then repeated in two hours if no improvement. (*Id.*)

Fuhrman underwent x-ray and MRI studies of her spine on March 13, 2003. The MRI study of her cervical spine showed "very minor degenerative disk changes"; "Chiari I malformation, unchanged from previous MRIs"; "Mild angulation of the cervical-medullary junction secondary to the Chiari I"; and "Otherwise negative cervical spine MRI." (R. 207) The MRI of her lumbar spine revealed "Very small posterior disk bulges at L2-3, L3-4 and L4-5 which are of no clinical significance neurologically"; "Very mild central spinal stenosis at L4-5"; and "Minor degenerative changes in the facet at L5-S1." (R. 205) The MRI of her thoracic spins showed "[v]ery minor degenerative changes in the mid thoracic spine but otherwise negative exam." (R. 206)

Fuhrman saw Kenneth Hunziker, M.D. on July 31, 2003, complaining of headaches. She had tried Imitrex-type preparations with no improvement, and currently

was taking Maxzide, Paxil, and Valtrex. She also reported being depressed and having trouble sleeping at night. The doctor gave her samples of Zyprexa to try at bedtime, and prescribed a trial of Neurontin for the headaches. He also promised to help Fuhrman get approval for a second opinion regarding her Chiari malformation. (R. 234)

Fuhrman called Dr. Hunziker's office on August 5, 2003, to report that she had an appointment to see a doctor in Chicago, and she needed a recent head MRI and cervical spine MRI. (R. 249) Dr. Hunziker ordered the MRI studies, which were performed on August 11, 2003. The studies showed no changes from Fuhrman's March MRI studies. (R. 229)

On September 23, 2003, Fuhrman saw Dan S. Heffez, M.D., a neurosurgeon, in Chicago, Illinois. Dr. Heffez performed a neurological examination and reviewed Fuhrman's MRI studies. His assessment was as follows:

> I believe the patient is suffering from symptomatic Chiari type I malformation. Certainly many of her symptoms are in keeping with a Chiari malformation. Her examination is only mildly abnormal but there are certainly abnormalities consistent with lower brain stem compression such as mild facial sensory loss, absent gag reflex, positive Romberg sign, Spinothalamic sensory level and some mild pyramidal tract findings. The imaging studies are certainly in keeping with a clear-cut Chiari type I malformation. I do not know circumstances of her past evaluation but I would at this time recommend suboccipital craniectomy for decompression. It is not likely that the patient['s] symptoms will improve without surgical decompression if they are indeed related to a Chiari malformation.

(R. 237) The doctor recommended Fuhrman undergo a suboccipital craniectomy and duraplasty graft. (*Id.*)

Fuhrman saw Dr. Hunziker on October 7, 2003, for assistance in completing forms necessary to prepare for her surgery. (R. 233) Dr. Hunziker completed an insurance claim form for Fuhrman on which the doctor opined Fuhrman had been permanently

disabled due to Arnold-Chiari malformation since May 8, 2002. (R. 261) He indicated Fuhrman was unable to work at any type of occupation "due to severe headaches, nausea, dizziness, [and] short term memory difficulties," and it was unknown whether she would be able to return to work at any time in the future. (R. 260)

On January 8, 2004, Fuhrman saw Dr. Hunziker for a comprehensive physical examination. She reported "doing pretty well," but still complained of generalized pain, muscle spasms and aches, trouble sleeping, and jumpy legs. (R. 245-46) She had read that many people with Chiari malformations also suffer from fibromyalgia and other rheumatoid conditions, and she questioned whether one of those conditions could be causing her pain. Dr. Hunziker felt Fuhrman had possible fibromyalgia or inflammatory arthritis. He noted she was awaiting surgical repair of her Chiari malformation. He ordered a number of diagnostic lab studies, and prescribed a trial of Flexeril. (*Id.*)

Fuhrman saw Dr. Hunziker again on January 23, 2004, for follow-up. She complained of additional difficulties including muscle spasms up and down her arms, "carpal pedal spasms" with some related anxiety, stiffness in her neck, difficulty swallowing and a choking sensation in her throat, dizziness, shortness of breath, blurry vision at times, nausea most of the time, and tremors and hand cramps. Because of the carpal pedal spasms and possibility of seizures, the doctor scheduled an EEG. In addition, he referred Fuhrman to R. Chad Wisco, M.D. for evaluation. (R. 243, 256)

Fuhrman had an EEG on February 4, 2004, which was normal both waking and sleeping. (R. 250) Dr. Hunziker gave Fuhrman samples of Zyprexa, and also a prescription for Flexeril. (R. 242) On February 17, 2004, Dr. Hunziker referred Fuhrman to Ralph T. Reeder, M.D. for evaluation. (R. 254-55)

On March 12, 2004, Fuhrman was evaluated by Dr. Reeder at The Center for Neurosciences, Orthopaedics & Spine, in Dakota Dunes, South Dakota. Fuhrman reported that Dr. Heffez in Chicago had declined to accept Fuhrman's Title XIX payment for the decompression surgery to correct her Chiari malformation. Fuhrman exhibited "increased

pain with Valsalva maneuvers with bending and also . . . dizziness with feelings of choking." (R. 269) She complained of tingling in both of her hands, and pain, burning, stiffness, and tingling in both feet. Dr. Reeder recommended Fuhrman have surgery to correct her Chiari malformation. (R. 268-69)

On March 25, 2004, Fuhrman underwent "[s]uboccipital craniectomy C1 laminectomy with duraplasty per foramen magnum decompression," and "[m]icrosurgical resection of tumor." (R. 264) Dr. Reeder noted that during the uncomplicated decompression procedure, he found a tumor emanating from the fourth ventricle, which was excised. Fuhrman spent six days in the hospital in connection with her surgery. She was discharged on March 31, 2004, with prescriptions for OxyContin and Percocet for pain, and Zofran and Compazine for nausea. (R. 264-68)

Fuhrman was seen for postoperative follow-up on April 23, 2004. She reported improvement in her ability to swallow, but still complained of residual aching throughout her body. Dr. Reeder stated the body aches might never resolve completely, and Fuhrman continued to take Flexeril for pain control. She also continued to take Paxil. Dr. Reeder directed Fuhrman "to remain off work for an additional 6 months," at which time she would have an MRI to assess her condition. He noted, "The patient understands that she may have residual symptoms and ultimately she will be able to return to work activities in spite of those aches and pains." (R. 274)

On May 10, 2004, Fuhrman was seen by Dr. Wisco for a rheumatological consultation on referral from Dr. Hunziker. (R. 371-73) Dr. Wisco took a full history and, following his examination, he reached the following conclusions:

> Total body pain process, most consistent with fibromyalgia. Today, I do not see any evidence of a systemic inflammatory disorder. I really do not see the problems of carpal pedal spasms either. Clinically, a lot of her symptoms are quite classic for fibromyalgia. Whether or not this was precipitated by the Chiari malformation is uncertain. The doctor who she saw in Chicago has written articles about his perceived

association of Chiari malformations and fibromyalgia. This is
a most controversial topic as whether or not the Chiari malfor-
mations are some sort of precipitating factor for fibromyalgia.

(R. 273) Dr. Wisco discussed "the basic premises of fibromyalgia" in detail with Fuhrman
and gave her literature on the disease. He recommended she continue with her existing
exercise program, be "attentive to any stressful situations that might exacerbate her
fibromyalgia-like process," and continue taking Flexeril. (*Id.*)


### 4. *Vocational expert's testimony*

VE William B. Tucker testified Fuhrman had acquired no skills in her past relevant
work that would transfer to other skilled or semi-skilled occupations that are less physical
in nature than her nursing job. (R. 355)

The ALJ asked the VE to consider an individual under fifty years of age who is
trained as a Registered Nurse and has Fuhrman's work history. In addition, the VE was
asked to assume the person "has medically determinable health problems that cause the
same work-related limitations, both exertionally and non-exertionally, described in [the
hearing testimony]." (R. 356) The ALJ asked the VE to state the vocational effect, if any,
on Fuhrman's ability to perform her past work or other work, if all of the hearing
testimony were found to be credible. The VE responded as follows:

> Well, certainly, in the case of past work – based on her
> testimony, she said she's only able to stand for minutes. She's
> only able to walk – I got the impression two to three blocks.
> She has some limitations in her ability to sit, so surely, the
> work as a general duty nurse, licensed nurse, or a nurse
> assistant would be out. And I would think – based on her
> testimony, she indicates that she has headaches, I think, three
> to four times a week, of a nature that she needs to go to bed to
> get some relief from it. I think that that alone would
> affectively [sic] eliminate any kind of full-time employment
> that I could identify.

22

(R. 356)   The VE noted headaches of that frequency would suggest an unacceptable absenteeism problem.  (*Id.*)

The ALJ then asked the VE the following question:

> Assume further that you're looking at a person of the same age, education, and work history as performed, who has the same work capabilities found by the state agency in their assessment.  And this is going to have two aspects.  There's going to be a physical and a mental.  First of all, the physical is . . . if you assume a person could occasionally lift or carry 20 pounds, frequently 10 pounds.  Could stand or walk or sit in each category with normal breaks, about six hours in an eight-hour day.  Push/pull is unlimited.  Postural activity is occasional.  There are no manipulative, visual, communicative, or environmental limits.  This would suppose light work, would it not?

(R. 357)  The VE agreed the hypothetical person could perform light or sedentary work. (*Id.*)

The ALJ then added the mental limitations set forth in the state agency assessment, which noted no areas of marked limitation, and moderate limitation in the areas of understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; sustaining an ordinary routine without special supervision; accepting instructions and responding appropriately to criticism from supervisors; and responding appropriately to changes in the work setting.  (R. 357-58; *see* R. 176-77)  Giving credibility to the mental and physical limitations set forth in the state agency assessment, the VE opined the individual would be unable to return to any of Fuhrman's past work, noting "[t]he nurse assistance is semi-skilled and the limitations in this hypothetical would eliminate any semi-skilled or skilled work."  (R. 358)  However, the VE opined the individual would be able to perform other work, including, for example, production assembler, laundry folder, or inspector and hand-packager.  (*Id.*)

## 5.    *The ALJ's decision*

The ALJ found Fuhrman had not engaged in substantial gainful activity since her alleged disability onset date of May 8, 2002.  (R. 18)  He found Fuhrman suffers from severe impairments including fibromyalgia and Arnold Chiari I Malformation, status post surgery on March 25, 2004.  (R. 24; *see* R. 19-24)  However, he found her impairments do not meet or equal the Listing criteria.  (R. 24)

The ALJ found Fuhrman's subjective complaints regarding her limitations not to be fully credible.  As grounds for this conclusion, the ALJ cited a work history report from Fuhrman's supervisor at the Longhouse Northshore Nursing Facility indicating Fuhrman's job performance had been less than stellar throughout her history at the facility.  The ALJ summarized the report as follows:

> It is interesting to note that [Fuhrman's supervisor Kathy Pettit], in this report, indicated that [Fuhrman's] work remained "borderline" throughout her employment at the nursing facility.  She described [Fuhrman] as lacking attention to detail, omitting things, and procrastinating to the point of total avoidance.  She pointed out that [Fuhrman] was "easily distracted" by "non-resident" issues and she often became involved in "non-work-related staff issue[s]."  Ms. Pettit further pointed out that [Fuhrman] made and received numerous personal phone calls and she was frequently absent from work.  Ms. Pettit stated that she did not observe any change in [Fuhrman's] work performance over time.  It is interesting to note that, despite these negative comments, Ms. Pettit described [Fuhrman] as intelligent, capable of learning new tasks quickly if they interested her, and she opined that Fuhrman' had "much to offer."  It is also interesting to note that Ms. Pettit stated that she would "possibly rehire" [Fuhrman] because [she] has "potential."

(R. 25)

The ALJ further gave little weight to Fuhrman's claim of complete disability because Fuhrman had continued to express to her physicians that she wanted to work and

"she felt capable of performing some type of work activity, however, she [had] not sought any employment within her soon-to-be established residual functional capacity." (*Id.*)

In discounting Fuhrman's credibility, the ALJ further noted the following:

> As pointed out previously in this decision, [Fuhrman] averred at the hearing that she has been unable to work since May 8, 2002, because she has been unable to function because of severe persistent headaches, memory problems, depression, pain, and fatigue. However, the record reflects that [Fuhrman], despite these alleged symptoms, subsequent [to] that time (i.e., in September of 2002), was capable of taking her children to school, driving on a daily basis, and completing a significant number of household chores, including doing laundry, washing dishes, changing sheets, vacuuming, sweeping, and cooking. [Fuhrman], at that time, (i.e., in September of 2002) was also involved in sewing, gardening, and canning [citation omitted]. These activities are considered inconsistent with the degree of symptomatology alleged by [Fuhrman] at hearing as well as in statements made in the record.

(*Id.*)

The ALJ identified numerous entries in Fuhrman's medical records that he viewed as inconsistent and detracting from the credibility of Fuhrman's subjective complaints regarding her limitations. (R. 25-27) The ALJ viewed the testimony of Fuhrman's mother, boyfriend, and former coworker/friend, to be "an extension of that of [Fuhrman]," not entitled to significant weight, and insufficient to outweigh "the other elements of the record that are found to be adverse to [Fuhrman]." (R. 27)

The ALJ discounted the opinions of Dr. Hunziker and Dr. Reeder that Fuhrman was unable to work, noting the issue of "disability" is reserved to the Commissioner, and further finding these opinions of Fuhrman's treating physicians to be based largely on Fuhrman's subjective complaints which the ALJ had found not to be entirely credible. (*Id.*)

In assessing Fuhrman's residual functional capacity to work, the ALJ concluded that although her "impairments prevent her from performing her past relevant work activity in the nursing field, . . . she retains the residual functional capacity for unskilled work at the light exertional level and jobs exist in significant numbers in the national economy which [she] can perform." (*Id.*) The ALJ cited, as examples of such jobs, production worker, laundry folder, and inspector/hand packager. R. 29) The ALJ noted he was "using Medical-Vocational Rule 202.21 as a framework for decision-making." (R. 31, ¶ 12) Because he found Fuhrman retained the RFC to work, he concluded she was not disabled, and denied her claim for benefits. (R. 31)

### III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

#### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598,

600 (8th Cir. 1997)). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(I).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a

medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon, supra.* The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner

will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

## B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). This review is deferential; the court must affirm the ALJ's factual findings if they are supported by substantial evidence on the record as a whole. *Id.* (citing *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002); *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *Kelley v. Callahan*, 133 F.3d 583, 587 (8th Cir. 1998) (citing *Matthews v. Bowen*, 879 F.2d 422, 423-24 (8th Cir. 1989)); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier, id.*; *Weiler v. Apfel*, 179 F.3d 1107, 1109 (8th Cir. 1999) (citing *Pierce v. Apfel*, 173 F.3d 704, 706 (8th Cir. 1999)); *accord Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)); *Hutton v. Apfel*, 175 F.3d 651, 654 (8th Cir. 1999); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at 1022 (citing *Craig*, 212 F.3d at 436); *Willcuts v. Apfel*, 143 F.3d 1134, 1136 (8th Cir. 1998) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488, 71 S. Ct. 456, 464, 95 L. Ed. 456 (1951)); *Gowell*, 242 F.3d at 796*; Hutton*, 175 F.3d at 654 (citing *Woolf*, 3 F.3d at 1213); *Kelley*, 133 F.3d at 587 (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline*, *supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse

the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997)); *Young*, 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217; *Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1)      the claimant's daily activities;
> 2)      the duration, frequency and intensity of the pain;
> 3)      precipitating and aggravating factors;
> 4)      dosage, effectiveness and side effects of medication;
> 5)      functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002).

## IV. ANALYSIS

Fuhrman argues the ALJ erred in finding her testimony and that of her witnesses not to be fully credible. She notes that if their testimony is found to be credible, then based on the VE's testimony, she would have "an intolerable absenteeism problem in any job," and she would be incapable of sustaining any type of competitive employment. (Doc. No. 7, pp. 10-11) However, Fuhrman offers no discussion to illustrate how the ALJ's credibility analysis was lacking.

Fuhrman alleges her disability began in May 2002. The court finds it significant that in July 2002, Fuhrman was considering returning to work as a treatment nurse, rather than a charge nurse, and in October 2002, she planned to try to find less stressful work that did not require acute memory skills. Her symptoms were stable and she indicated she would put off further evaluation and continue on her current medications.

In reviewing the *Polaski* factors, the court notes Fuhrman's daily activities were not significantly limited, her functional restrictions were not such that she would be precluded from all types of work activity, and she reported no significant adverse side effects from her medications. Therefore, as Fuhrman notes in her brief, the only "fighting issue" in this case is the credibility of her allegation that she was disabled from all types of work due to headache pain. While the court finds some support in the record for Fuhrman's subjective complaints, the record also contains significant evidence that Fuhrman's condition was not as severe as she claims. As noted above, the court may not reverse the Commissioner's decision simply because the court might have weighed the evidence differently, or because the record contains evidence to support an opposite conclusion. In cases where, as here, the record contains evidence to support two inconsistent positions,

the court must affirm the Commissioner's decision. *Roe*, 92 F.3d at 675. Accordingly, the court finds the Commissioner's decision should be affirmed.

## *V. CONCLUSION*

For the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED**, unless any party files objections[3] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1)(C), Federal Rule of Civil Procedure 72(b), and Local Rule 72.2, within ten (10) days of the service of a copy of this Report and Recommendation, that the Commissioner's decision be affirmed.

**IT IS SO ORDERED.**

**DATED** this 6th day of January, 2006.

_____
PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[3]Objections must specify the parts of the report and recommendation to which objections are made. Objections must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections. *See* Fed. R. Civ. P. 72. Failure to file timely objections may result in waiver of the right to appeal questions of fact. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).